**Marion GIBBONS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 63010.**

Court of Criminal Appeals of Texas, Panel No. 1.

June 23, 1982.

Rehearing Denied July 7, 1982.

Will Gray, Simonton, for appellant.

John B. Holmes, Jr., Dist. Atty., James C. Brough, and Douglas Shaver, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, TOM G. DAVIS and W. C. DAVIS, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for attempted theft of property valued over $10,000.00. V.T.C.A. Penal Code, Sec. 31.03. The jury found appellant guilty and the court assessed punishment at ten years and a $2,500.00 fine, probated.

In appellant's first ground of error, he challenges the sufficiency of the evidence. He argues that the evidence is insufficient to prove that the appellant committed an act that amounted to more than mere preparation to effect the alleged offense.

The indictment under which appellant was convicted alleges in pertinent part:

"Marion Gibbons hereinafter referred to as the Defendant, heretofore on or about August 27, 1976, did then and there unlawfully with the intent to commit theft, attempt to appropriate property, namely money, of the value of over ten thousand dollars, owned by James L. Ballard, hereafter styled the Complainant, with the intent to deprive the Complainant of the property, and without the effective consent of the Complainant, by negotiating a settlement of an invalid workman's compensation claim for Donnie J. Dukes."

The appellant, a practicing attorney in Houston, was retained to represent Donnie Dukes in a claim for workers' compensation. Appellant was employed by means of a power of attorney executed February 17, 1976. Dukes had been previously injured on a construction job and on March 10, 1976 the appellant, in behalf of Dukes, sent the Industrial Accident Board (IAB) a notice of injury and claim for compensation with copies to Dukes' employer and to the insurer, Liberty Mutual Insurance Company. Dukes claimed he was due compensation for a spinal injury [1] inflicted when he attempted to lift steel pipe at a job site. A laminectomy was later performed in an attempt to ease the spinal pain Dukes suffered.

On July 19, 1976 appellant phoned James Ballard, a Liberty Mutual Insurance Adjuster, and discussed Dukes' claim. Ballard noted in a memo to Dukes' file that appellant demanded $20,000.00 to $23,000.00 to settle the claim. Ballard, and his supervisor Larry Oggletree, testified that company policy did not allow an adjuster to settle a claim for such a high amount. Any claims

---

1. Under the Workers Compensation Act Dukes' injury is classified as a "general" injury. Simply put, a general injury is an injury which under the Act is not defined as allotted specific compensation. Examples of specific injuries include the loss of a limb or the digits on a hand or foot. See Worker's Compensation Act, Part I, Section 12.

in excess of $15,000.00 required prior approval of Liberty Mutual's home office in Boston before final settlement. Ballard testified he made no agreement to settle the claim because he lacked authority from the home office. On July 2, 1976, Darrell Briscoe, Ballard's claims supervisor, independently determined Dukes' claim to be worth about $17,000.00 but that the claimant was asking $20,000.00 and noted these figures in Dukes' file.

On August 18, 1976 Dukes was shot by his half-brother and subsequently died on August 19th. Appellant learned of the shooting on the day it occurred, and was notified of Dukes' death on the morning he succumbed to the gunshot wound. Appellant had advanced Dukes $1,000.00 in anticipation of his claim, as well as having a 25% interest in the statutory contingency fee allowable under the claim. Appellant sought the advice of two other attorneys, A. D. Downer and Matthew Plumber, who officed in his building. Downer testified that the appellant told him on August 19th that he had already negotiated a $16,000.00 settlement on Dukes' claim. Appellant also related to Downer that he had notified Dukes of the settlement. Appellant failed at this time to inform Liberty Mutual Insurance Company of Dukes' death.

Katherine Dukes, wife of the deceased, testified that her husband did not inform her of any settlement agreement. She stated that appellant phoned her in Alabama on August 24, 1976, two days after her husband's funeral. Appellant advised her "not to tell anyone in Texas that Donnie was dead ... that he thought he could get a claim through, and not to let the insurance company know that Donnie was dead until he found out." On September 17, 1976 appellant wrote Katherine offering to represent her and her children in an effort to collect her husband's claim. Katherine, however, had contacted Jim Baker, an Alabama attorney, who advised her that in his

opinion the claim did not survive Dukes' death.

In the interim, appellant continued with the claim. On August 24th Briscoe requested authorization from the home office to settle Dukes' claim for $17,000.00. Approval was granted and on August 27, 1976 Ballard had a Compromise Settlement Agreement (CSA)[2] prepared for "$16,000, plus three years open medical." On the same day, appellant called Briscoe to have the CSA sent to him. Ballard and Briscoe both testified that they had made no settlement agreements antecedent to August 27, 1976. Ballard stated he would not have settled had he known Dukes was dead.

On August 30, 1976 Ballard sent the CSA, executed by Briscoe for Liberty Mutual, to appellant. With the CSA, Ballard included a cover letter which instructed the appellant:

"Attached you will find a C.S.A. for $16,000. PLS. have it signed and approved by the Board. When this is done, contact me and I will see that the check is issued."

On the same date, Ballard sent appellant a CSA involving Raul Gomez, another client of appellant's who had a worker's compensation claim.

On September 7, 1976 appellant contacted Liberty Mutual Insurance Company again in reference to the Dukes claim. Ballard was absent from work so appellant spoke with Briscoe and arranged to meet for lunch on the following day. Briscoe testified that during this meeting appellant offered him a $1,000.00 "bribe" to settle the Dukes claim and the Gomez claim which Ballard had also recently sent to appellant. Appellant told Briscoe that Gomez would not accept the $13,000.00 offered by Liberty Mutual in settlement, rather Gomez wanted $25,000.00. Appellant suggested $12,000.00 of the $16,000.00 settlement for the Dukes case be transferred to the Gomez case.

---

**2.** A Compromise Settlement Agreement, or CSA, is a standard "boilerplate" form completed by the parties in a workers' compensation dispute. It is evidence that an agreement has been agreed to between insurance carrier and claimant. The CSA document is then filed with the IAB for approval. See also *Starnes v. TEIA*, 549 S.W.2d 46 (Tex.Civ.App.—Dallas 1977, writ. ref. N.R.E.).

This would give $25,000.00 to Gomez and leave $4,000.00 for the Dukes claim. Briscoe told appellant he was unable to make such an arrangement because it would be unacceptable to the Industrial Accident Board, and it would adversely affect the insurance rate of Gomez's employer. Appellant then stated he could "get around" the problem with the Industrial Accident Board and offered Briscoe "a grand" if he could arrange to get this through the Liberty Mutual office. Briscoe told appellant he was not interested and broke off further talks in the meeting. Briscoe reported the incident to Oggletree and wrote a memo of what had transpired for the file.

Later the same day, Briscoe telephoned the appellant. He reiterated his refusal to accept the proposed compromise of claims, but inquired how appellant could get such a deal approved by the Industrial Accident Board. At this point appellant informed Briscoe he could not have the Compromise Settlement Agreement executed by Dukes because he was now deceased. Briscoe stated this was his first knowledge that the claimant was dead.

Appellant testified in his own behalf. He acknowledged that he continued to negotiate the Dukes claim after the death of the claimant. He testified that he continued to negotiate the claim in hopes of being able to represent Dukes' heirs or the estate. Appellant sought the CSA as evidence so that the estate could prove a settlement had been reached. Appellant maintains he informed Briscoe on September 7th that Dukes was dead, at which time Briscoe denied liability on the claim. The purpose of the meeting on September 8 was for Briscoe to show appellant some legal authority supporting Liberty Mutual's denial of liability. Appellant stated he did not attempt to bribe Briscoe, rather, he said he offered to settle the Dukes claim for $8,000.00 because it would cost Liberty Mutual Insurance Company at least that much to litigate whether the claim survived the claimant's death.

It is uncontradicted that appellant never forged Dukes' name to the CSA, nor did he sign it as the attorney of record. The CSA was never executed. Also, no claim in the Dukes case was ever submitted to the Industrial Accident Board.

Under V.T.C.A. Penal Code, Sec. 15.01 a person commits an offense of attempted theft if, with the specific intent to commit theft, "he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." Sec. 15.01, supra.

The State argues that several acts committed by appellant amount to more than mere preparation. Specifically, the State points to the fact that appellant continued to negotiate Dukes' claim, after the claimant died, as evidence of attempted theft. The State notes that appellant sought to cover up knowledge of Dukes' death, and falsely represented his client was alive to representatives of Liberty Mutual Insurance Company. Further, appellant gained a Compromise Settlement Agreement by deception. Finally, appellant sought to settle both the Dukes' claim and an unrelated claim for Gomez by "bribing" a representative of Liberty Mutual.

It is clear that the actions of appellant constitute unethical behavior, however, we are unconvinced that his specific acts amounted to more than mere preparation or that the evidence proves specific intent was to commit theft. Both the appellant and the State produced "expert" witnesses knowledgeable in the filing and processing of claims to the Texas Industrial Accident Board (IAB). These experts testified that certain procedures, established by rules of the IAB must be followed prior to any compensation issuing from an insurance carrier.

Paul Godwin, an attorney and office manager for the Houston IAB branch office, testified for the State. He stated a CSA is not final until it is submitted to the Board and approval given by the IAB to the settlement. Godwin noted that a CSA for Dukes was never submitted by appellant to the IAB.

A. E. Downer, an attorney with 25 years of experience in workers' compensation law,

testified for the defense. He testified that a CSA must be recorded with the IAB for approval. Downer said appellant had discussed the case with him on the day of Dukes' death. Appellant told him Dukes was dead, but that he had already settled with Ballard of Liberty Mutual for $16,000.00. Downer admitted that he suggested appellant pursue the claim. In his opinion, appellant had at his disposal several avenues for recovery. Downer felt a claim for permanent partial injury, even though also a general injury, could survive the death of the claimant. He testified that although the law dictates weekly benefits, paid to a claimant in lieu of lost wages, do not survive death there may be a claim under contract law for the settled amount. Further, Downer stated that a lawyer who had a power of attorney from the claimant would have a valid and proper claim for his fees in working on the case. Such fees exist even though the client died of an independent and intervening cause of death. Finally, if the attorney could link the cause of death to the injury the general injury claim would still remain viable. Downer stated that the caselaw propounded by the State as evidence that a general claim unconditionally becomes invalid upon the death of the claimant is not dispositive of the Dukes' claim. Rather, the Supreme Court in *Bailey v. Travelers Insurance Co.*[3] dealt only with the termination of unaccrued weekly benefits, and not the entire claim of the worker and his estate.

James Patterson, an attorney who worked for the IAB in Austin and as a private practitioner in Houston, testified for the defense. He stated all CSA's must be submitted to the IAB for approval before payment would issue. In his opinion a claim which was disapproved could not be determined valid or invalid by the IAB until the case had been finally pursued through the courts. Patterson also concluded that he knew of no duty per se binding an attorney to reveal the death of his client to an insurance carrier.

Erna Hullum, a "Resident Reviewer" with ten years experience at the IAB, testified for the defense. She stated that it was her IAB assignment in Houston to process all claims concerning Liberty Mutual Insurance Company. Hullum testified a CSA had never been presented to the IAB for the Dukes case. Further, the Dukes' CSA offered as a State's exhibit would have been rejected because it lacked the requisite signatures of the claimant and his attorney. She stated she had never met the appellant and was only familiar with his name through IAB paperwork. Appellant had never offered her a bribe to get the Dukes case or any other worker's compensation matter through the Board. She stated she would have rejected any CSA between Liberty Mutual and appellant for $4,000.00 because it "was definitely too low."

William Kilgarlin, an attorney with extensive worker's compensation experience, testified for the defense. He stated he had settled over two thousand workers' compensation claims. In his opinion a CSA had to be submitted and approved by the IAB before collection of the claim. Kilgarlin felt that there was little chance of success in Dukes' claim, however "if you want to assert that the death was caused, you have the right to assert it."

Likewise, William A. Conners, Jr., an attorney with twenty-five years of experience in worker's compensation and general practice, testified "a compromise settlement agreement has no authority until it has been approved by the Board."

The testimony is uncontradicted that appellant procured a CSA form from Liberty

---

3. In *Bailey v. Travelers Insurance Co.*, 383 S.W.2d 562 (Tex.1964), the worker died four days after a judgment from the Eastland Court of Civil Appeals awarded him lump-sum permanent disability benefits. The death was unrelated to the injury. The insurance carrier filed a motion with the Court of Civil Appeals to have the judgment modified so as to only allow payment of weekly disability payments for the period Bailey was alive, and the appeals court so amended the award. The Texas Supreme Court reversed agreeing that unaccrued weekly benefits do not survive a general injury, however, because there was a lump-sum award in *Bailey* the claim did survive death.

Mutual Insurance Company. All notations on the form are made by the insurance firm. It is equally clear that this CSA was never executed by appellant, nor the name of Dukes fraudulently affixed as claimant. Likewise, the record establishes the CSA was never submitted to the Board. The Rules of the Industrial Accident Board-Workers' Compensation state in pertinent part:[4]

> "061.08.00.020. Compromise Settlement Agreements between insurance carriers and persons claiming benefits under the Texas Workers' Compensation Law *are not final until approved by the Board* (1953)
> " . . .
> "061.08.00.030. A Compromise Settlement Agreement must contain the following information:
> > "(1) *That the agreement is executed* and completed on a form approved by the Board.
> > " . . .
> "061.08.00.100. Settlement Agreements entered into by claimants who are represented by an attorney *must be signed by the attorney.* The attorney's name and address shall be on the face of the agreement." (Emphasis Added.)

Therefore, prior to appellant's acquisition of any moneys from the carrier he would have had to have forged Dukes' name upon the CSA; signed the document himself; submitted the CSA to the Houston IAB; had the Houston Board approve the settlement; and finally submitted the CSA to the Austin IAB and gained approval.

In the instant case the circumstances surrounding the alleged offense are complex in both facts and proof. At the center of the determination of whether the evidence is sufficient, lies the consideration of which acts demonstrate appellant moved beyond mere preparation. Such a determination can be difficult under the most simple of facts. The authors of the practice commentary to Sec. 15.01, supra, discuss these problems associated with a definition of attempt:

> "Section 15.01 defines attempt in traditional terms, cf. *Lovett v. State,* 19 T[ex]. 174 (1856); Penal Code art. 1402. To constitute attempt, there must be an act, which must be performed with intent to commit a crime. (Although attempt purports to be available for all offenses, it is improbable that a person will perform an 'act' with intent to commit a crime of omission, see the definition of 'act' in Section 1.07, and impossible that a person 'intend' to commit a crime involving recklessness or criminal negligence.) An act and intent alone, however, will not suffice for attempt. The actors conduct must progress beyond 'mere preparation' and must tend to effect commission of the crime.
> "The courts have confronted two major problems with attempt definitions similar to that in Section 15.01. One involves the determination in each of the infinite number of fact situations that may arise of the point at which attempt responsibility attaches. There is little difficulty when the actor does everything necessary to commit the intended offense, but the intended result does not occur. For example, it is clearly attempt when the actor's bullet misses its intended target, when the victim does not die from his wounds, or when someone discovers the bomb and disarms it before the time it is set to explode. (In the last example, if the actor changes his mind voluntarily and disarms the bomb himself, the renunciation defense, see Section 15.04, will be available.) If the actor's course of conduct is interrupted or otherwise frustrated before the crime is complete, however, Section 15.01 provides little guidance. If the actor solicits another to offer a bribe, for example, he is clearly not responsible for an attempt since that conduct is covered by Section 15.03 (although it

---

4. The Industrial Accident Board is governed by provisions of the Administrative Procedure and Texas Register Act (Tex.Rev.Civ.Stat.Ann. Art. 6252–13a Vernons 1981–82). Under the authority of Tex.Rev.Civ.Stat.Ann. Art. 8307, Sec. 4, Vernons 1981–82 they have promulgated the above rules. See also, Flahive & Ogden, *Texas Workers' Compensation Manual,* 1981.

wouldn't be criminal since bribery is not a first-degree or capital felony), and if he buys a pistol intending to use it in a bank robbery, he is only preparing. If he enters the bank, sees a policeman in the lobby, and abandons his objective, has he committed an attempt? The policeman may arrest him for some other reason and discover plans for the robbery, but arguably his conduct never reached a point where it tended to effect the robbery. The 1970 proposed code adopted the approach of the Model Penal Code, which would have established attempt responsibility before conduct progressed to the point that it tended to effect commission of the offense. It required only that there be a 'substantial step' toward commission, but that the actor's entire course of conduct be strongly corroborative of his intent to commit the offense." V.T.C.A. Penal Code, Sec. 15.01, Practice Commentary.

Recent caselaw has made a more definitive interpretation of when the acts of the accused go beyond mere preparation. In *Hart v. State*, Tex.Cr.App., 581 S.W.2d 675, a defendant challenged the attempted murder indictment against him by urging it did not allege an act beyond mere preparation. This Court through analogy distinguished what constituted mere preparation as opposed to acts constituting attempt: [5]

"While simple acquisition and possession of a weapon would, in most situations, be preparation, putting that weapon to use to inflict injuries clearly goes beyond preparation." 581 S.W.2d at 678.

In *Cody v. State*, Tex.Cr.App., 605 S.W.2d 271, the defendant was charged with attempted arson. The evidence showed he had poured gasoline on the floor of a high school and had wadded up paper and placed it in and near the flammable liquid. Cody was also discovered to have matches in his

pocket. In finding that he had crossed over the portal beyond mere preparation this Court reasoned, "Appellant had prepared the scene of the offense to the extent that the only act yet to be accomplished in order to complete the offense was the actual setting of the fire." 605 S.W.2d at 273.

The defendant in *Bledsoe v. State*, Tex. Cr.App., 578 S.W.2d 123, was convicted for attempted burglary of a vehicle. He was apprehended while crouching between two cars in a parking lot. A screwdriver and a clothes hanger were discovered on the pavement in near proximity to him. No scratch or pry marks could be found on the car, however, and the accused had not attempted to flee the scene. In reversing the Bledsoe conviction for insufficient evidence this Court noted the absence of any affirmative acts by the defendant:

"In the present case, however, there is no evidence that appellant touched the complainant's vehicle, or that he was unlawfully upon the premises where the vehicle was parked, consequently, we are unable to point to an affirmative act by the appellant which amounted to more than mere preparation but failed to effectuate the intended offense." 578 S.W.2d at 125–126.

█ It is well established that the attempt statute does not require that every act short of actual commission be accomplished in order for one to be convicted of an attempted offense. *Hackbarth v. State*, Tex.Cr.App., 617 S.W.2d 944; *Cody v. State*, supra. Concomitantly, however, the statute requires "an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." V.T.C.A. Penal Code, Sec. 15.01, see, e.g., *Torres v. State*, Tex.Cr.App., 618 S.W.2d 549; *Solis v. State*, Tex.Cr.App., 589 S.W.2d 444; *Hobbs v. State*, Tex.Cr.App., 548 S.W.2d 884.

---

5. The dissent in *Doty v. State*, Tex.Cr.App., 585 S.W.2d 726, employs a similar analogy to differentiate between attempt and mere preparation:

"The point may be better illustrated by an example. Even if there had been an additional allegation that either the appellant or Cur-

tis had obtained a gun with which to kill Linda Faye Doty, the allegations would not have been sufficient, because obtaining the gun would show mere preparation to commit the intended offense of murder." 585 S.W.2d at 733 (Dally, J., dissenting).

Viewing the evidence in the light most favorable to the judgment of the trial court, see *Fernandez v. State*, Tex.Cr.App., 564 S.W.2d 771; *Banks v. State*, Tex.Cr. App., 510 S.W.2d 592, the evidence is sufficient to show appellant continued to represent his client after his client's demise and the nullification of appellant's power of attorney. Such an act alone bears no criminal penalty. Nor is the possession of a unilaterally executed CSA an offense within the Penal Code. Significantly lacking from the State's proof is any indication that appellant intended to fraudulently affix his dead client's name to the document and present the CSA to the Industrial Accident Board for approval. Not even the damaging testimony regarding the "bribe" can be shown to constitute more than mere preparation. The testimony shows that the "bribe" was designed to garner another CSA for Dukes with a lower claim amount from Liberty Mutual Insurance Company. Considering that appellant already possessed one CSA, the procurement of a second does not advance him any further beyond his prior acts of preparation. Furthermore, appellant's acts never advanced beyond these initial steps and the promise to pay Briscoe was subsequently repudiated in a phone conversation on the same day the "bribe" was offered. No further acts were taken by appellant in the year and half between September 8, 1976 and his indictment on March 15, 1978.

Convictions for attempted offenses under 15.01, supra must necessarily be considered on a case-by-case basis. E.g. *Hackbarth v. State*, supra; *Solis v. State*, Tex.Cr.App., 589 S.W.2d 444; *Bledsoe v. State*, supra. The testimony proved that in order to collect funds on a claim to the IAB the appellant must submit an executed CSA to the Board. Although the acts alleged in the case at bar are admittedly more complicated than the attempted burglary alleged in *Bledsoe*, supra, it still holds true that we cannot point to an "affirmative act" committed by the appellant which is beyond mere preparation. Likewise, comparing the example applied in *Hart*, appellant's acquisition of the CSA without use is not so far

removed from a defendant who takes "simple acquisition and possession of a weapon [which] would, in most situations, be preparation." *Hart v. State*, Tex.Cr.App., 581 S.W.2d 675, 678.

Finally, in comparison to the facts of *Cody v. State*, supra, we find appellant had not prepared the "scene" of the offense to an extent that the only act which remained uncommitted was the actual commission of the offense. The requisite approval of the IAB stood squarely between appellant and possession of the insurance money.

Under the specific facts of this case we find appellant did not commit acts beyond mere preparation, therefore the evidence was insufficient to support his conviction.

The judgment of conviction is set aside and reformed to show an acquittal.