

NUMBER 13-09-00528-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CARLOS F. CISNEROS A/K/A
CARLOS CISNEROS,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                 Appellee.

## On appeal from the 197th District Court
## of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant, Carlos F. Cisneros a/k/a Carlos Cisneros, of two counts

of attempted indecency with a child (counts one and two) and one count of injury to a child

(count three). *See* TEX. PENAL CODE ANN. § 15.01 (Vernon 2003), § 21.11(a)(1), (d)

(Vernon Supp. 2009) (providing that engaging in sexual contact with a child is a second-degree felony), § 22.04 (Vernon Supp. 2009) (providing that a person who acts with criminal negligence and causes bodily injury to a child commits the offense of injury to a child, a state-jail felony). Cisneros pleaded "true" to the State's enhancement allegation.[1] The court assessed punishment at ten years' imprisonment for count one, twenty years' imprisonment for count two, and two years' imprisonment for count three, with all three sentences running concurrently. By four issues, which we construe as two, Cisneros claims that the evidence is legally and factually insufficient to support his conviction for the offense of attempted indecency with a child. We affirm.

## I. BACKGROUND

### A.    Officer Sanchez

At approximately 5:06 a.m. on July 5, 2008, Brownsville police officer Jose Luis Sanchez responded to a disturbance at Cisneros's home. Officer Sanchez testified that when he arrived, he met with Rose Rodriguez and two of her daughters, R.R. and R.L.R.[2] Officer Sanchez noticed that R.R. and R.L.R. "were crying, sobbing" and "seemed distraught and mainly scared." Rose told Officer Sanchez that her family had given Cisneros a ride to his home after a party in their Expedition, which was equipped with three rows of seats. R.R. and R.L.R. sat in the third-row seats close to the passenger's side of the vehicle, and Cisneros sat at an angle in the second-row seat on the passenger's side. Rose told Officer Sanchez that when the family arrived at their home after dropping off

---

[1] In 1994, Cisneros was convicted in the state of Michigan for the offense of sexual assault and was sentenced to fifteen years' imprisonment. Cisneros completed his sentence and moved to the Brownsville, Texas area sometime between 2006 and 2007.

[2] To protect the children's privacy, we refer to them by their initials and to their relatives by pseudonyms. *See* TEX. R. APP. P. 9.8.

Cisneros, R.R. and R.L.R. told her that Cisneros had placed his left arm over the seat and inappropriately touched them. After hearing this, Rose and her family returned to Cisneros's home to "confront him and also file a police report."

On cross-examination, Officer Sanchez stated that Rose told him that Cisneros had "put his hand under their [R.R. and R.L.R.'s] dress [sic] and touched them both on their legs and buttocks" and "tried to put his hand in their vaginal area [sic]." Officer Sanchez also stated that he was unaware that R.R. alleged that Cisneros scratched her hand.

## B. Juan Rodriguez

R.R. and R.L.R.'s father, Juan Rodriguez, testified that he, his wife, and their four children, Linda, R.R., R.L.R., and Juan Jr., attended a quinceañera on July 4, 2008. Juan testified that after the quinceañera ended at around midnight, Cisneros approached him and asked if he could have a ride to an after-party that Juan and his family planned to attend. Juan told Cisneros that there was no room in his vehicle, and Cisneros found another ride to the after-party. Juan stated that as the family prepared to leave the after-party at around 3:30 or 3:45 a.m., Cisneros approached and asked if they would give him a ride home. Initially, Juan refused, but after discovering that Cisneros's home "was on the way," he acquiesced.

Juan testified that he sat in the front passenger seat and Rose drove when the family left the after-party. Juan's fifteen-year-old daughter, Linda, sat on the driver's side in the second row; his three-year-old son, Juan Jr., sat in a child's car seat in the middle of the second row; and Cisneros sat on the passenger's side of the second row. A box of decorations sat on the driver's side of the third row, and R.R. and R.L.R. sat in the remaining room on the third row seat, towards the passenger's side of the vehicle. Juan

3

stated that he asked his wife to stop at a convenience store soon after the family left the after-party so that he could trade seats with Linda. At the convenience store, Linda moved to the front passenger seat, and Juan moved to the passenger's side of the second row seat. The family then drove twenty to thirty minutes before dropping Cisneros off at his house.

Juan stated that once the family arrived at their home, his wife and children went inside the house, but that two or three minutes later, his wife "came outside crying[,] telling [sic] me what this man had done to my daughters." Juan became angry and he, Rose, R.R., and R.L.R. went back to Cisneros's home. On the way to Cisneros's home, Rose called the police.

On cross-examination, Juan testified that he drank alcohol at the quinceañera and the after-party. Juan also admitted that he did not mention that a box was in the third- row seat with R.R. and R.L.R. when he gave a statement to police. Juan stated that, although he sat on the second-row seat with Cisneros during the ride from the after-party to Cisneros's home, he barely spoke to Cisneros because, "I was on the cell phone, and because of the loud music." Juan also stated that he did not see Cisneros touch R.R. or R.L.R. and that, although he heard R.R. and R.L.R. talking on the way to Cisneros's home, he was unable to understand what they were saying.

## C.     Rose Rodriguez

Rose testified that Cisneros approached Juan and asked for a ride when she and her family began to leave the after-party at approximately 4:00 a.m. Rose stated that Juan originally said no, but then changed his mind and told Cisneros that they would give him a ride home. Rose stated that Cisneros rode in the second-row seat directly in front of her

eleven-year-old daughter, R.R. According to Rose, her eight-year-old daughter, R.L.R., sat between R.R. and a box of decorations located on the driver's side of the third-row seat. Juan originally sat in the front-passenger seat, but then switched seats with his daughter, Linda, and sat on the driver's side of the second-row seat. After leaving the convenience store, Rose encountered a traffic accident and was forced to take an alternate route. Rose testified that during the ride to Cisneros's house, she heard Juan talk to Cisneros until Juan received a phone call. At one point in the trip, Rose saw Cisneros sitting with "his back . . . leaning on the window on the door," and his "arm on the seat." She also heard him tell R.R. and R.L.R. "that he was going to help them."

The family dropped off Cisneros at his home and drove approximately five minutes to their home. Once at home, Rose took her three-year-old son out of the Expedition and carried him towards the house. Before getting inside, she heard one of her daughters crying, and Linda yelled for her to come talk to R.R. and R.L.R. As Rose approached, Linda told her that Cisneros had touched R.R. and R.L.R. Rose testified that R.R. told her that Cisneros "was using force. She said that she was only trying to fight him back like take his hands away from her." Rose later testified:

> R.R. said that . . . [Cisneros] put his hand under her dress[;] she was pushing him away. She told me that he scratched her and that she would tell him like—she was making a face to leave her alone, to get away. She told me that she had to kneel down in order for her, you know, to be kind of—to get away from him, to put her legs away from where he was. Then she got her sister's legs and she tried to keep them with her so he wouldn't touch them.

Additionally, Rose stated that R.R. and R.L.R. told her that Cisneros told them twice, "I'm trying to help you." Photographs of scratches on R.R.'s hand taken by Rose shortly after she filed a police report were admitted into evidence. Rose testified that R.R. sustained

the scratches by "forcing [Cisneros] away."

Rose testified that after her daughters told her about Cisneros's actions, she and Juan took their daughters and drove back to Cisneros's house. On the way, Rose called 911 and asked to "file a report." Rose drove around Cisneros's neighborhood until police arrived at his house and then parked in front of his house and talked to the police.

On cross-examination, Rose stated that when she asked her daughters why they had not said something when Cisneros allegedly touched them, one of her daughters responded, "I couldn't talk. I was scared. I was scared of dad. I was scared of you. I was scared of what was going to happen," and "I was so scared I just couldn't talk." Rose also admitted that she did not take either R.R. or R.L.R to the hospital or to a doctor after the alleged occurrence.

### D.     Linda Rodriguez

Linda testified that she is sixteen years old and the sister of R.R. and R.L.R. Linda stated that she sat in the middle seat of the Expedition when her family left the after-party, but moved to the front seat at the direction of her father shortly after leaving the after-party. Linda stated that during the ride to Cisneros's house, Cisneros sat "slanted" and "wasn't facing completely to the front" and that she heard Cisneros tell her sisters that he was "trying to help them." When the family arrived at home after dropping off Cisneros, Linda lowered the second row seat so that her sisters could get out of the Expedition's third-row seat. As she lowered the seat, she noticed that both of her sisters were crying and asked them what had happened. R.R. told her that Cisneros "had touched them." Linda called to her mother to come over, and the sisters told Linda and their mother that Cisneros had touched above the knee on the "outside part" of R.R.'s right leg and had also touched

6

R.L.R.'s knees. R.R. also told Linda that "she tried pushing him away, but he would kind of like force her hand to be able to touch her." Linda testified that she saw scratch marks on R.R.'s hands and attributed the scratches to Cisneros.

On cross-examination, Linda stated that she did not remember telling police officers that Cisneros put his hand near R.R.'s or R.L.R.'s vaginal area or that he touched their buttocks.

## E.    R.L.R.

R.L.R. stated that when she was eight years old, she attended a quinceañera and an after-party with her family. When the family left the after-party, Cisneros asked Juan for a ride home. R.L.R. testified that she and R.R. sat in the third row seat and that Cisneros sat in the second row seat in front of R.R. R.L.R. stated that during the ride to Cisneros's home, "in a dark place," Cisneros turned around "just like a little bit," "put his hand back," and touched R.R.'s "upper leg." R.L.R. testified that R.R. tried to "pull away," and then Cisneros "started touching me on my knee. . . . My legs were already on top of [R.R.], my sister, and I couldn't do anything more." R.L.R. recalled that when the family arrived home, R.R. told Linda and Rose what happened.

On cross-examination, R.L.R. explained that Cisneros had touched both of her knees "like maybe for a minute," but did not touch her legs or grab her. R.L.R. also explained that her father was talking on his cell phone when Cisneros touched her and R.R., and that Cisneros whispered that "he was trying to help us" while he touched their knees and legs.

## F.    R.R.

7

R.R. testified that she attended a quinceañera with her family on July 4, 2008. After the quinceañera ended, the family went to an after-party where the family stayed for an hour or two. R.R. heard Cisneros ask her dad for a ride and then Cisneros got into the Expedition and sat in the middle seat on the passenger side in front of R.R. R.R. stated that the family then drove to a convenience store, where her dad switched places with Linda. R.R. testified that after leaving the convenience store, "there was an accident, a car accident. I think there was [sic] cops and they told us to turn. So when we turned we went to a dark street, and that's when everything started to happen." R.R. then stated that Cisneros "was like leaning on the door" and "reached down and touched [R.L.R.]'s knees and touched my legs." R.L.R. moved her legs on top of R.R. and R.R. "moved R.L.R.'s legs like to that side [sic] so he wouldn't be able to touch her more and he got to touch me." R.R. testified that she was wearing a black dress and that Cisneros touched her legs under her dress and said that he was "trying to help" her. R.R. stated that when Cisneros said this, she "didn't know what he was talking about," and "asked him what he was talking about" and "why was he trying to help" her because she "didn't even know him." When R.R. tried to push Cisneros, he continued reaching for her legs "using force" and, at some point, scratched R.R.'s hand. R.R. stated that Cisneros's actions were not accidental and that "[h]e knew he was doing it." On cross-examination, R.R. testified that she was unsure how long Cisneros attempted to touch her but that "it felt like it was long." R.R. also stated that on the ride home, her dad "was drunk" and she was not sure whether he heard her ask Cisneros why he said he was trying to help her.

After presenting the above evidence, the State rested, and no witnesses were called by the defense. After deliberating, the jury convicted Cisneros on two counts of attempted

8

indecency with a child for his conduct towards R.R. and R.L.R. *See id.* §§ 15.01, 21.11(a)(1), (d). Cisneros was also convicted of injury to a child for the injury he caused to R.R. by scratching her hand. *See id.* § 22.04. The court assessed punishment at ten years' imprisonment for count one, twenty years' imprisonment for count two, and two years' imprisonment for count three, with all three sentences running concurrently. This appeal followed.

## II. LEGAL AND FACTUAL SUFFICIENCY

### A.    Standard of Review

In reviewing the legal sufficiency of evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistences in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When conducting a factual sufficiency review, an appellate court views all of the evidence in a neutral light. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will set aside the verdict only (1) if the evidence supporting the conviction is too weak to support the verdict, or (2) when the evidence supporting the verdict is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Laster*, 275 S.W.3d at 518 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)); *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning what weight to be given to contradictory testimony. *Lancon*, 253 S.W.3d at 705.

The State is not required to present direct evidence to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49. Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

A person commits indecency with a child if he engages in sexual contact with a child younger than seventeen years old. TEX. PENAL CODE ANN. § 21.11(a)(1). A person

commits an attempted indecency with a child if, with specific intent to commit the offense, the person "does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended."  TEX. PENAL CODE ANN. § 15.01(a).

## B.      Analysis

On appeal, Cisneros contends that "the alleged acts by [a]ppellant, if at all, were mere preparatory conduct which did not cross the line to criminal conduct."  Additionally, Cisneros contends that the evidence is insufficient to support his conviction because the alleged events occurred in the Rodriguez's Expedition, "in close proximity to the entire family of the alleged child victims," and "[n]o one saw [Cisneros] touch [R.R.] and/or [R.L.R.] or witness him engage in any other conduct or acts that even caused them to be suspicious."

Texas courts have recognized that there is an "imaginary line" that separates mere preparatory conduct, which is usually noncriminal, from an act which tends to effect the commission of an offense, which is always criminal conduct.  *Flournoy v. State*, 668 S.W.2d 380, 383 (Tex. Crim. App. 1984); *McCravy v. State*, 642 S.W.2d 450, 460 (Tex. Crim. App. 1980); *Jones v. State*, 229 S.W.3d 489, 497 (Tex. App.–Texarkana 2007, no pet.).  "The fact that an appellant could have taken further actions without actually committing the offense does not act so as to render his or her actions nothing more than mere preparation."  *Jones*, 229 S.W.3d at 498 (citing *Hackbarth v. State,* 617 S.W.2d 944, 946 (Tex. Crim. App. 1981)).  Where the imaginary line is drawn is determined on a case-by-case basis by considering the nature of the crime attempted.  *Id.* (citing *Gibbons v. State*, 634 S.W.2d 700, 707 (Tex. Crim. App. 1982); *Henson v. State*, 173 S.W.3d 92, 102-03 (Tex. App.–Tyler 2005, pet. ref'd) (holding that the defendant's act of soliciting a child

to help him with work around his house was not more than mere preparation to commit the offense of indecency with a child; however, the defendant's request that the child allow the defendant to commit a sexual act on him was more than mere preparation)).

The record reveals that Cisneros was an acquaintance that the Rodriguez family agreed to drive home after a quinceanera after-party. R.R. testified that Cisneros sat directly in front of her on the drive to his home. Both R.R. and her mother stated that they encountered an automobile accident while driving to Cisneros's home and that they were forced to take an alternate route. R.R. described the alternate route as "dark" and as the place where "everything started to happen." R.R. testified that Cisneros "lean[ed] on the door" and "reached down and touched R.L.R.'s knees" and R.R.'s legs. R.R. also testified that Cisneros used "force" as he touched her legs and that he touched her legs under her dress, but did not touch her "private part." According to R.R., Cisneros's actions were not accidental and "[h]e knew he was doing it."

Similarly, R.L.R. testified that "in a dark place," Cisneros turned around "just like a little bit" and "put his hand back" behind his seat and began to touch her and R.R. R.L.R. stated that Cisneros touched both of her knees and R.R.'s "upper leg." Both R.R. and R.L.R. testified that R.L.R. attempted to keep Cisneros from touching her by placing her legs on top of R.R.'s lap. R.R. and R.L.R. also testified that Cisneros whispered that he was "trying to help" while he touched their knees and legs.

Officer Sanchez stated that Rose told him that Cisneros "put his hand under their [R.R. and R.L.R.] dress [sic] and touched them both on their legs and buttocks" and "tried to put his hand in their vaginal area [sic]." However, at trial, Rose did not allege that Cisneros touched R.R. and R.L.R.'s buttocks, nor did she expressly state that he attempted

12

to touch her daughters' vaginal areas. Rose testified that R.R. told her that Cisneros "was using force. She said that she was only trying to fight him back like take his hands away from her." Rose also told the jury:

> R.R. said that . . . [Cisneros] put his hand under her dress, she was pushing him away [sic]. She told me that he scratched her and that she would tell him like—she was making a face to leave her alone, to get away. She told me that she had to kneel down in order for her, you know, to be kind of—to get away from him, to put her legs away from where he was. Then she got her sister's legs and she tried to keep them with her so he wouldn't touch them.

Rose and Linda testified that they heard Cisneros tell R.R. and R.L.R. that he was trying to help them. Rose also stated that she saw Cisneros sitting with "his back . . . leaning on the window on the door," and his "arm on the seat." Linda described Cisneros as sitting "slanted" and in a position that "wasn't facing completely to the front." Additionally, the jury heard evidence that after the alleged touching, R.R. and R.L.R. were crying, distraught, and upset.

It was within the province of the fact-finder to judge the credibility of the witnesses and decide the weight to be given to the various testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007); *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003). Moreover, "'[a] jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused . . . .'" *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)).

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found that Cisneros, a virtual stranger who, riding in a dark vehicle in close proximity to two children, used force to reach under the dress of one child to touch her leg

13

and to touch the knees of the other child, crossed the "imaginary line" between mere preparation and attempt. *See Jones*, 229 S.W.3d at 498; *Henson*, 173 S.W.3d at 102-03. Accordingly, we hold that the evidence was legally sufficient to support Cisneros's conviction on both counts of attempted indecency with a child. *See Laster*, 275 S.W.3d at 517; *see also Jones*, 229 S.W.3d at 498; *Henson*, 173 S.W.3d at 102-03. In addition, viewing the evidence in a neutral light, we cannot say that the jury's verdict is clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414. Thus, we conclude that the evidence supporting Cisneros's conviction for attempted indecency with a child is factually sufficient. *See Lancon*, 253 S.W.3d at 704; *see also Jones*, 229 S.W.3d at 498; *Henson*, 173 S.W.3d at 103. We overrule Cisneros's issues on appeal.

## III. CONCLUSION

We affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
24th day of August, 2010.

14