**Opinion issued November 10, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00450-CR

———————————

**DANIEL LYNN EASTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 506th District Court**
**Waller County, Texas**
**Trial Court Case No. 13-02-14323**

---

## MEMORANDUM OPINION ON REHEARING

Appellant, Daniel Lynn Easter, filed a motion for rehearing of our August 30, 2016 opinion and judgment. We deny his motion, withdraw our opinion and judgment of August 30, 2016, and issue the following opinion and a new judgment in their stead.

A jury found appellant guilty of the felony offense of attempted theft by deception from a non-profit organization.[1] The trial court assessed his punishment at confinement for six months, suspended the sentence, and placed him on community supervision for two years. In four issues,[2] appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in denying his motion for new trial and overruling his objections to portions of the State's closing argument.

We affirm.

## Background

Archie Glenn Hashaw, Jr., executive director of Waller County Emergency Medical Service ("Waller County EMS"), a non-profit organization and the complainant in this case, testified that Waller County EMS provides "9-1-1

---

[1]    *See* TEX. PENAL CODE ANN. §§ 15.01(a), (d) (Vernon 2011) (criminal attempt), 31.03(a) (Vernon Supp. 2015) (theft); *see also id.* § 31.03(f)(3) (offense of theft "increased to next higher category of offense" if owner of appropriated property was non-profit organization).

[2]    In his first issue, appellant contends that this Court "lacks jurisdiction on appeal because [his] motion for arrest of judgment was GRANTED and the State did not appeal the trial court's ruling." Prior to the submission of appellant's case, we granted the State's "Motion to Abate Appeal and Remand Case to Trial Court for Clarification of Order and For Correction of Record *Nunc Pro Tunc*." We noted that the trial court's order on appellant's "Motion in Arrest of Judgment" did not make clear whether it "intended to arrest the judgment or merely intended to suspend imposition of the sentence until the resolution of any appeals." The trial court subsequently clarified its order and denied appellant's "Motion in Arrest of Judgment." Thus, we need not address appellant's first issue and will limit our review to his remaining four issues. *See* TEX. R. APP. P. 47.1.

2

ambulance service" for the county. It shares "a building in downtown Monaville," designated as Fire Station Number 2, with the Monaville Volunteer Fire Department (the "Monaville VFD"). And appellant serves as fire chief for the Monaville VFD.

Hashaw explained that Waller County EMS, pursuant to a "joint venture agreement," built Fire State Number 2 "jointly" with the Monaville VFD, with the intention that the two entities would jointly "share the building for the common good of the community." Fire Station Number 2 is a "metal building" with "living quarters," "a couple of bedrooms," "common living area," "bathrooms," "some bays" for the fire trucks, and "a spot" for Waller County EMS to use.

Although Waller County EMS and Monaville VFD originally intended to "share the expenses" related to the building "50/50," not all expenses, in reality, are shared equally between the two. In regard to the electric bill, for example, Hashaw noted that Waller County EMS pays one-hundred percent of the bill and then sends an invoice to the Monaville VFD for approximately twenty-five percent of the electricity cost. The Monaville VFD in turn "send[s] EMS the money" that it owes for its portion of the bill.

Hashaw further testified that the relationship between Waller County EMS and the Monaville VFD has not been "smooth[]" during the time that they have shared Fire Station Number 2. They have had "disagreements" and "issues" "getting along." Specifically, the Monaville VFD "wants the building for [its] own. [It]

3

wants [Waller County EMS] out. [It] ha[s] threatened to evict [Waller County EMS]." And the Monaville VFD has sent Waller County EMS "demand letters" "asking [it] to leave the premises" and "threatening" to hire an attorney "to evict [it] out of the building." Waller County EMS has also "endured actual person to person harassment [of its] EMS crews at the station."

In regard to Fire Station Number 2's parking lot, Hashaw, "[a]t some point," "learn[ed] that [it] . . . had been improved or had new pavement put on it." On January 5, 2012, Rhonda Becvar, Waller County EMS's office manager, received an invoice, the "first" "formal[]" request for payment, from the Monaville VFD related to the parking lot improvement. The invoice, dated December 22, 2011 and admitted into evidence as State's Exhibit 1, requests payment of $2,500 "[d]ue upon receipt." And the "Description" portion of the invoice states: "Pro-Line Materials Invoice #4264 redo parking lot station 2 required payment in full upon completion your half to be reimbursed to" the Monaville VFD. Hashaw explained that the invoice essentially "ask[ed] for [Waller County EMS] to pay 50 percent of what [the Monaville VFD] s[aid] [it] paid for some work done" on Fire Station Number 2's parking lot. According to Hashaw,

> the first time [he] knew about [any] parking lot improvement[,] or as the invoice says ["]Pro-Line Materials, Invoice 4264, redo parking lot at Station 2, required payment in full upon completion; your half to be reimbursed to [the] Monaville [VFD"] . . . was when [Waller County EMS] w[as] asked to pay for it[.]

4

A second invoice, dated December 22, 2011 and admitted into evidence as State's Exhibit 2, is from ProLine Materials, Inc. ("ProLine") to the Monaville VFD, requesting payment of $5,000. The "Description" portion of the invoice states: "Completely re-do parking lot at Station 2." At the top of the invoice is the notation, "PAID By Check." And included with the invoice, in State's Exhibit 2, is a photograph of the front portion of a check written by the Monaville VFD to ProLine for $5,000.

After receiving State's Exhibit 1, Waller County EMS asked the Monaville VFD "for a copy of the cancelled check" because it did not have "any previous knowledge" of "ow[ing] anybody [the] money" for the parking lot improvement. In response, the Monaville VFD provided Waller County EMS with State's Exhibit 2. Hashaw explained, however, that the Monaville VFD never "produce[d] a cancelled check" to evidence its payment to ProLine. Instead, the Monaville VFD only "produced" a check "written" to ProLine but which "never went to the bank."

On November 7, 2012, the Monaville VFD sent to Waller County EMS another copy, admitted into evidence as State's Exhibit 3, of the ProLine invoice to the Monaville VFD for $5,000. Hashaw explained that this constituted "another request" by the Monaville VFD for reimbursement from Waller County EMS for the parking lot improvement.

5

Hashaw noted that he did not personally have any direct dealings with appellant about the parking lot improvement or the Monaville VFD's repeated requests for payment of $2,500. However, he explained that neither he, nor "any representative of Waller County EMS," was ever "told don't worry about th[e] $2,500, it was not paid for, it was a donation." And, "as far as [he] knows," "to this day" Monaville VFD is "still requesting the $2,500" from Waller County EMS. Appellant also never told Hashaw that the Monaville VFD's invoice, in which it requested payment of $2,500 from Waller County EMS, was a "mistake" or Waller County EMS should not "worry about [paying] it."

Becvar testified that, as the office manager of Waller County EMS, she handles "all of the bookkeeping, secretarial [responsibilities], reception, janitorial [duties], . . . payroll, accounts payable, [and] accounts receivable." And she is "the person responsible for paying the bills of Waller County EMS."

Becvar explained that on December 5, 2011, the Monaville VFD made a "reimbursement request[]" for $2,500 for "Pro-Line Asphalt, parking lot" at a "Building Committee" meeting between it and Waller County EMS. At the meeting,[3] the Monaville VFD provided Waller County EMS with a "list of items"

---

[3] According to Becvar, the "Building Committee" meeting occurred after appellant had told her that Waller County EMS "owed" the Monaville VFD $20,000 and advised her that each entity's respective representatives were "having a problem getting" together "to sit down and iron out some expenses that needed to be handled." Appellant spoke to Becvar about this matter in a "demanding" tone, and

6

for which it requested reimbursement. The "list," admitted into evidence as State's Exhibit 5, is titled, "Reimbursement Request to EMS from MVFD 12-5-11." In it, the Monaville VFD represents that it "[p]aid" $5,000 to "Pro[L]ine" for "[p]arking [l]ot" "[m]aintenance." And it requests "[r]eimbursement" in the amount of $2,500 from Waller County EMS, stating that "[p]ayment [is] due within 30 days."

Becvar also testified about certain email communications, admitted into evidence as State's Exhibit 6, between Waller County EMS and the Monaville VFD. Specifically, on December 27, 2011, the Monaville VFD, in an email from Joanne Gregory, a Monaville VFD board member, to Deena Elliot, a Waller County EMS board member and representative that attended the "Building Committee" meeting, again requested $2,500 from Waller County EMS for the parking lot improvement. In the email, Gregory asks, "Can you please advise when/if [the Monaville VFD] can expect a check for the $3,340[] ($2500[] for Driveway and $840[] for EMS bay door)." And appellant was included on this email communication. Moreover, Gregory, on January 5, 2012, sent an email to Becvar, requesting "a status update" about the Monaville VFD's previously requested payment of $3,340—$2,500 of

---

he took "an active part in the financial affairs" of the Monaville VFD. "About a month later," a Waller County EMS representative "met with the [B]uilding [C]ommittee" for the Monaville VFD as a result of Becvar's conversation with appellant.

which was related to the parking lot improvement. Appellant was also included on this email communication.

Following Gregory's emails, Waller County EMS "requested . . . a copy of proof of payment for the [ProLine] invoice" so that it could verify that the Monaville VFD "actually paid for [ProLine's] services." Becvar specifically requested "a copy of a cancelled check" from the Monaville VFD "to prove that [it] did pay for [the parking lot improvement]." As she testified: "I e-mailed . . . Gregory and asked her if either she or [the Monaville VFD] accountant could provide [Waller County EMS with] a copy of [the] cancelled check that paid for the driveway repairs." Becvar explained that although she had, on January 5, 2012, received "a copy of a check" from the Monaville VFD "for $5,000" with a copy of a "paid [ProLine] invoice," she needed "[a] copy of the cancelled check," "[m]eaning [a copy of] the front and [the] back" of the check to verify "[p]roof of payment." In other words, Becvar needed "[p]roof" that the $5,000 check written by the Monaville VFD to ProLine had been actually "[c]ashed" or "[d]eposited." However, the Monaville VFD never provided such proof.

Becvar further testified that in November 2012, the Monaville VFD "again asked" Waller County EMS "to pay $2,500 for the parking lot" improvement. And the Monaville VFD sent, by certified mail, another copy of ProLine's invoice to Waller County EMS with the "PAID By Check" notation at the top.

8

According to Becvar, no one from the Monaville VFD had "ever represented to Waller County EMS" that the parking lot improvement constituted a "donation" from ProLine. And no one from the Monaville VFD, "since th[e] . . . request for payment was made[] [in] November of 2012," ever informed Waller County EMS that it did not "owe the money" and it should "ignore the . . . request for payment." And, as far as she was aware, the Monaville VFD's request for payment of $2,500 was "a pending invoice" at the time of her testimony.

Davis Reid Dawson, the owner of ProLine, testified that it "suppl[ies] and manufacture[s] different types of asphalt materials to the State, [the] County, [and] . . . municipalities." He "know[s]" appellant, and ProLine has had, with the Monaville VFD, "business dealings," which he described as providing "donations throughout the years."

In 2010, appellant "approached" Dawson, while he was at appellant's restaurant, "want[ing] to know if [ProLine] wanted to make a donation" to the Monaville VFD. Dawson agreed, and ProLine made its "first donation" to the Monaville VFD by creating "an asphalt apron in front" of its water storage tank so that its fire trucks could be "suppl[ied]" with water.

In 2011, appellant "asked" Dawson to make another donation to the Monaville VFD by "install[ing] recycled millings . . . to extend the parking lot or the truck parking at the . . . main headquarters for th[e] fire department in Monaville." As he

9

did in 2010, appellant approached Dawson while he was at appellant's restaurant. Appellant stated, "Hey, would you like to, you know, donate -- need some help with extending the parking lot," to which Dawson replied, "Certainly."

Dawson noted that ProLine followed-through and made, to the Monaville VFD, a donation, consisting of "suppl[ying] the goods and labor to extend the parking lot . . . at the Monaville [VFD] to the west[,] . . . where [the fire] trucks come in because it was just bare dirt." ProLine provided "probably 10 loads or so of recycled asphalt" and "made a nice driveway so [that the Monaville VFD's fire] trucks and people could park there." The area where "[t]he donation was made" originally consisted of "just grass and mud." ProLine "came in with a recycled product [it] make[s] at [its] shop and did th[e] whole area, installed it, rolled and compact[ed] it, and then went around the red tank to kind of the back of the building . . . where [the fire] trucks pull in from the back so it would be nice, recycled asphalt around there."

Dawson explained that State's Exhibit 10 is "an actual invoice" from ProLine that corresponds with its 2011 donation to the Monaville VFD. Appellant came to ProLine's office and "instructed" Dawson to "create" the invoice. According to Dawson,

> [appellant] stopped by the shop and [they] visited. And [appellant] just said he needed an invoice so that – [Dawson] guess[ed] for his records. [Dawson] didn't really ask [appellant] a bunch of questions. [He] assumed [that appellant] was using it for value purposes for the

10

donation or his bookkeeping. And [Dawson's] secretary printed [the invoice] out.

. . . .

As far as [Dawson] c[ould] remember, [appellant] just -- he showed up. . . . And so, this was -- this was after the work was done . . . . And [appellant] sat down with [Dawson's secretary] and [Dawson], and [they] discussed what document he needed for his purposes. And this [was] how [the invoice] was generated.

. . . .

[Appellant] told [ProLine] to create th[e] [invoice].

Appellant told Dawson to "generate an invoice" for a certain amount and said "[n]othing" about indicating on the invoice that the Monaville VFD had requested a donation from ProLine. Appellant simply "wanted [Dawson] to create th[e] invoice," and he "instructed" Dawson to put "$5,000 on th[e] invoice."

After appellant obtained "a hard copy" of the invoice, he then told Dawson that he "could toss" any other copies of the invoice, i.e., "throw it away," which Dawson did. In other words, Dawson's secretary "deleted" the electronic version of the invoice after it had been "printed and given to" appellant. The deletion occurred while appellant was "still" at ProLine's office. And appellant was the only person to ever receive a copy of the invoice.[4]

---

[4]     Dawson further noted that although State's Exhibit 10 is in the form of an "actual" invoice that ProLine's "computer bookkeeping system" would generate, the "PAID By Check" notation at the top of the invoice is "in a different spot" from where ProLine's system would usually make such a notation. And he explained that "the

11

Dawson further testified that no one, other than appellant, ever "solicit[ed] donations" from ProLine on the behalf of Monaville VFD. And no one, other than appellant, ever "ha[d] any discussions" with him about creating the ProLine invoice, State's Exhibit 10. "All of [Dawson's] interactions . . . regarding [ProLine's] donations" to the Monaville VFD were "solely with" appellant.

Further, ProLine "never actually d[id] financial business" with the Monaville VFD, which had never "pa[id] [ProLine] for services." And ProLine has never "received any money from" the Monaville VFD "for anything," nor "expected that [it] would receive money from" the Monaville VFD "for anything," because all of its work for the Monaville VFD had been "a donation." Finally, Dawson explained that appellant "asked for th[e] donations" from ProLine and "told [Dawson] how to make the[] invoice[]." ProLine "[n]ever received a check" from the Monaville VFD, and it specifically did not receive the check included in State's Exhibit 2.

Amy Williams, the owner of Williams Business Solutions, a bookkeeping and payroll company, testified that she "do[es] the[] books" for the Monaville VFD. Since she began working with the Monaville VFD, she "ha[s] kept all [its] books," "paid [its] bills," "mail[ed] out [its] bills," gotten its "CPA for tax preparation," and "handl[ed] [its] audits."

---

notation of 'Paid by check' was not a part of the actual invoice that [he] and [his] company created, assembled, and provided to [appellant]."

On December 22, 2011, Williams received an invoice, State's Exhibit 3, from ProLine to the Monaville VFD. The invoice was "placed" in her office, and she was "told to pay th[e] document" by a member of the Monaville VFD's Board of Directors. However, Williams could not recall who specifically instructed her to pay the invoice or how it had arrived in her office. And she noted that the "PAID By Check" notation on the invoice was not "put . . . there" by her. She assumed that "it was like that when [she] got [the invoice]."

After being instructed to pay the ProLine invoice, Williams "created an invoice for [Waller County] EMS" from the Monaville VFD, State's Exhibit 1, which she mailed on December 22, 2011. The invoice requested reimbursement from Waller County EMS in the amount of $2,500 for ProLine's work improving the parking lot. She also sent to Waller County EMS a copy of ProLine's invoice to the Monaville VFD, along with a copy of the front portion of the check for $5,000 that she had written to ProLine. Williams explained that she sent Waller County EMS these items "[t]o show" it that the Monaville VFD was "paying [the ProLine invoice] in full." Williams noted, however, that although she had written a check to ProLine for the parking lot improvement from the Monaville VFD's "personal [checking] account," she "did not mail th[e] check" to ProLine. And she explained that she had "never" actually paid the ProLine invoice. Instead, she subsequently

13

"voided" the check because appellant "told" her that the parking lot improvement had actually been "donated" by ProLine.

Further, Williams testified that she asked appellant "why" the Monaville VFD was asking Waller County EMS "to pay [it] this money" when the parking lot improvement had been "donated." In response, appellant said that "he would take care of it," and she assumed that he would "handle" the situation. Further, after appellant and Williams both knew that the parking lot improvement had been donated, they agreed that if Waller County EMS "were to write [a] check" for the parking lot improvement, the Monaville VFD "could refund it or . . . apply [the money] to what" Waller County EMS owed. And Williams, on "at least . . . two occasions," spoke with appellant about "the specific invoice from Pro-Line." She believed that appellant would talk with Gregory, the Monaville VFD board member in contact with Waller County EMS, about resolving the matter. Williams, however, admitted that she took no action to "squash" the Monaville VFD invoice that she had sent to Waller County EMS, requesting reimbursement for the parking lot improvement.

On January 6, 2012, Williams became aware that the Monaville VFD was "still attempting to collect" $2,500 from Waller County EMS and "EMS was still under the impression that . . . [it] owed $2,500." However, by January 6, 2012, she knew that the parking lot improvement had been donated, and she "didn't want any

14

money from . . . Waller County EMS." On January 30, 2012, Williams became aware that Waller County EMS had "made" a request for "a copy of the front and back of the check" that she had written from the Monaville VFD's "personal [checking] account" to ProLine for $5,000. And she "called" appellant about this request.

Williams also testified about two letters, admitted into evidence as Defense Exhibit 6, sent by the Monaville VFD to Waller County EMS in October and November 2012. Attached to the October 19, 2012 letter is a spreadsheet titled "Monaville Volunteer Fire Department Expenses to split with EMS." Included in the spreadsheet is the $2,500 reimbursement that the Monaville VFD had requested from Waller County EMS for the parking lot improvement. Williams explained that she had mistakenly included the ProLine invoice in the list of "Monaville Volunteer Fire Department Expenses to split with EMS." In regard to the November 6, 2012 letter, which also includes the spreadsheet, Williams explained that although she had removed the parking lot improvement reimbursement request from the spreadsheet, she still erroneously included the ProLine invoice in the "stack" of invoices sent to Waller County EMS with the letter and spreadsheet.

Gregory testified that she was previously a member of the Monaville VFD and "when [she] ceased [being] involved" with it, she was a captain and "sitting on the Board of Directors." In regard to Fire Station Number 2, she explained that

15

Waller County EMS "stay[s] in the living quarters and run[s] [its] ambulances out of th[e] . . . building whenever [it] s[ees] fit to use it" and the Monaville VFD uses the building "to house . . . the fire trucks at all times." According to Gregory, Waller County EMS and the Monaville VFD do not "get along" "very well."

Gregory noted that in the fall and winter of 2011, appellant was a member of the Monaville VFD's Board of Directors and served as fire chief. As a member of the board, appellant's "duties and responsibilities" included being "concerned about the finances of the fire department." And during this time, Waller County EMS and the Monaville VFD were "having issues" about who had the "responsibilit[y] of paying certain bills" related to Fire Station Number 2.

On December 5, 2011, Gregory, having been assigned to work on these issues, met with two Waller County EMS representatives to "discuss[] the [relevant] bills." During the meeting, "there was [a] little discussion regarding the parking lot [improvement]," although the Monaville VFD did not yet have an invoice from ProLine. Gregory, however, included the parking lot improvement on the Monaville VFD's written "Reimbursement Request to EMS from MVFD 12-5-11," State's Exhibit 5, because appellant had told her, prior to the meeting, that the "Pro-Line asphalt bill was going to be $5,000."

Following the meeting, Gregory and Becvar exchanged email communications "regarding the payment of th[e] invoice to Pro-Line." The

16

substance of these communications was that Gregory had "finally" been "told" by the Monaville VFD that "the invoice had been submitted to [Waller County] EMS for the driveway."

Gregory explained that she continued to pursue the Monaville VFD's reimbursement request to Waller County EMS because appellant had "told [her] that [an] invoice had been turned into EMS" and ProLine had given the Monaville VFD an invoice for the parking lot improvement. Gregory did note that appellant had previously, "early on," possibly "before the driveway was put down," told her that the parking lot improvement was a donation. However, because "there was an invoice just like an invoice for [any of] the other items" for which the Monaville VFD was requesting reimbursement from Waller County EMS, Gregory came to believe that the parking lot improvement was an "expense" rather than a donation. Williams never contacted Gregory to inform her that there was no need to collect any money from Waller County EMS or that the Monaville VFD's invoice to Waller County EMS should be "squash[ed]."

Gregory further testified about an email communication, admitted into evidence as State's Exhibit 9, that Becvar sent to her on January 30, 2012. In the email, Becvar requested "a copy of the cancelled check" from the Monaville VFD to ProLine for the parking lot improvement. When Gregory "forwarded" Becvar's request to appellant, he responded, "No, that [is] asking too much. Tell them not to

17

park on it." And appellant never said anything to Gregory to correct her belief that Waller County EMS owed the Monaville VFD $2,500 for the parking lot improvement.

The trial court admitted into evidence portions of appellant's grand jury testimony in which he conceded that although the parking lot improvement by ProLine was a "donation," he, in January 2012, "realized [that Williams] ha[d] billed Waller County EMS for $2,500." Nevertheless, he "never sent" Waller County EMS "anything" and "never said a word to" Waller County EMS about the Monaville VFD's reimbursement request for the parking lot improvement.

After the jury found appellant guilty and the trial court entered its judgment, appellant filed his "Initial Motion for New Trial," asserting that the "trial court ha[d] the discretion to grant [him] a new trial in the interest of justice." Subsequently, appellant filed his "First Amended Motion for New Trial" to which the State objected as "untimely." The trial court, concluding that it was "precluded from ruling on any matters not raised in [appellant's] Original Motion for New Trial," denied appellant's new-trial motion.

**Sufficiency of Evidence**

In his fourth issue, appellant argues that the evidence is legally insufficient to support his conviction because the "only direct evidence came from" a single witness

and the State did not prove "the requisite 'deception' element," that he had an intent to deprive, and that his "acts amounted to more than mere preparation."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2015). Appropriation of property is "unlawful" if it is "without the owner's effective consent." *Id.* § 31.03(b)(1). Consent is not effective if it is "induced by deception." *Id.* § 31.01(3)(A) (Vernon Supp. 2015). Relevant to this case, deception means

either (1) "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true" or (2) "failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true." *Id.* § 31.01(1)(A)–(B).

A person commits the criminal offense of attempt if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends[,] but fails[,] to effect the commission of the offense intended." *Id.* § 15.01(a) (Vernon 2011); *see also Herrin v. State*, 125 S.W.3d 436, 440 n.5 (Tex. Crim. App. 2002) (elements of criminal attempt). Thus, a person attempts to commit theft if he, with specific intent to commit theft, does an act amounting to more than mere preparation that tends but fails to effect the commission of the theft. *See* TEX. PENAL CODE ANN. § 15.01(a).

As an initial matter, we note that appellant complains of the lack, and quality, of "direct evidence" presented by the State at trial. Specifically, he asserts that "[t]he only direct evidence came from" a single witness, Dawson, whose testimony is "extremely weak," "severely impeached," and constituted "little evidence of [a]ppellant's guilt."

However, we, in conducting our review of the sufficiency of the evidence, treat direct and circumstantial evidence equally because circumstantial evidence is as probative as direct evidence in establishing the guilt of a defendant. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is "direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven." *Taylor v. State*, 684 S.W.2d 682, 684 (Tex. Crim. App. 1984). And it alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Further, the "cumulative force" of all the circumstantial evidence in a case can be sufficient to support a jury finding of guilty beyond a reasonable doubt.[5] *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

Thus, even were we to assume that appellant is correct that "[t]he only direct evidence came from" a single witness and that evidence is "extremely weak," "severely impeached," and constitutes "little evidence of [his] guilt," our review of the sufficiency of the evidence does not end there. Instead, we must consider all of the evidence, including both direct and circumstantial, in the light most favorable to the jury's verdict, to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89.

---

[5]  We note that every fact and piece of evidence need not point directly and independently to a defendant's guilt. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

21

Appellant asserts that there is "no evidence showing how [he] did anything that likely caused EMS to pay the ProLine . . . invoice" and "[t]he State failed to prove" that he "knew" that the Monaville VFD was "'due no reimbursement' . . . or that he knew" that the Monaville VFD was "'not owed $2,500.'" (Emphasis omitted). In other words, appellant asserts that the evidence is "not sufficient to prove beyond a reasonable of doubt" "the requisite 'deception' element." We note that when the State accuses a defendant of theft by way of deception, it *must* prove deception. *Fernandez v. State*, 479 S.W.3d 835, 838 (Tex. Crim. App. 2016).

Appellant next asserts that there is "insufficient evidence to prove [he] intended to deprive" Waller County EMS "of property." To prove an attempted theft, the State must show that a defendant had an intent to steal, i.e., an intent to unlawfully appropriate property with the intent to deprive the owner of the property. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996); *see also Hicks v. State*, No. 12-13-00158-CR, 2014 WL 1922619, at *2 (Tex. App.—Tyler May 14, 2014, no pet.) (mem. op., not designated for publication) (distinguishing between "theft" and "attempted theft," noting "a person commits attempted theft if, *with the specific intent to commit theft,* []he does an act amounting to more than mere preparation" (emphasis added)); *Sorce v. State*, 736 S.W.2d 851, 856 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd) ("The culpable mental state of the offense of attempt is that the [defendant] had the specific intent to commit an offense, in this case, theft by

22

deception."). "A verbal demand is not the talisman of an intent to steal." *See Johnson v. State*, 541 S.W.2d 185, 187 (Tex. Crim. App. 1976).

A person acts with intent "when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011). Intent may be inferred from circumstantial evidence, including the words, acts, and conduct of the defendant. *Wolfe*, 917 S.W.2d at 275; *Roberson v. State*, 821 S.W.2d 446, 448 (Tex. App.—Corpus Christi 1991, pet. ref'd).

Finally, appellant asserts that the evidence is "not sufficient to prove beyond a reasonable doubt" that his "acts amounted to more than mere preparation to deprive [Waller County EMS] of property." According to appellant, his "conduct never reached a point that amounted to more than mere preparation."

The statute establishing the criminal offense of attempt draws an "imaginary line" between mere preparatory conduct, which is usually non-criminal, and an act which tends to effect the commission of the offense, which is always criminal conduct. *See* TEX. PENAL CODE ANN. § 15.01(a); *Adekeye v. State*, 437 S.W.3d 62, 68–69 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (internal quotations omitted); *Jones v. State*, 229 S.W.3d 489, 497–98 (Tex. App.—Texarkana 2007, no pet.) (internal quotations omitted); *see also McCravy v. State*, 642 S.W.2d 450, 460 (Tex. Crim. App. 1980). Where the imaginary line falls must be determined on a case-by-case basis. *See Gibbons v. State*, 634 S.W.2d 700, 707 (Tex. Crim. App.

23

[Panel Op.] 1982); *Adekeye*, 437 S.W.3d at 68–69. A person may commit an attempt even if he could have taken further actions without actually committing the intended offense. *See Hackbarth v. State*, 617 S.W.2d 944, 946 (Tex. Crim. App. [Panel Op.] 1981); *Adekeye*, 437 S.W.3d at 69. In other words, "[t]he fact that a[] [defendant] could have taken further actions without actually committing the offense does not act so as to render his . . . actions nothing more than mere preparation." *Jones*, 229 S.W.3d at 497; *see also Hackbarth*, 617 S.W.2d at 946.

Here, we conclude that the State presented ample evidence to establish that appellant, in attempting to obtain $2,500 from Waller County EMS, acted deceptively and with the intent to deprive Waller County EMS of $2,500. We further conclude that the State presented ample evidence that appellant's actions in doing so amounted to more than mere preparation.

The evidence establishes that in 2011, appellant "asked" ProLine to make a "donation" to the Monaville VFD by "install[ing] recycled millings . . . to extend the parking lot or the truck parking at the . . . main headquarters for th[e] fire department in Monaville." ProLine agreed to make the donation and "supplied the goods and labor to extend the parking lot" at Fire Station Number 2. ProLine provided "probably 10 loads or so of recycled asphalt" and "made a nice driveway so [that the Monaville VFD's fire] trucks and people could park there."

24

After ProLine completed the work, appellant "stopped by" its office and "instructed" Dawson to "create" an "invoice," State's Exhibit 10, for the parking lot improvement. Although appellant "told" Dawson "to create" or "generate an invoice" for a certain amount, he said "[n]othing" about indicating on the invoice that it represented a donation from ProLine. Appellant also "instructed" Dawson to put "$5,000 on th[e] invoice." When ProLine "created, assembled, and provided to" appellant the invoice, it did not include a "PAID By Check" notation.

After appellant obtained "a hard copy" of the invoice, he told Dawson that he "could toss" any other copies of the invoice, i.e., "throw it away," which Dawson did. In fact, Dawson's secretary, while appellant was at ProLine's office, "deleted" the electronic version of the invoice after it had been "printed and given to" appellant. Thus, appellant was the only person to ever receive a copy of the invoice. Further, Dawson testified that no one, other than appellant, ever "solicit[ed] donations" from ProLine on behalf of the Monaville VFD. And no one, other than appellant, ever "ha[d] any discussions" with Dawson about creating the ProLine invoice, State's Exhibit 10. Dawson only "interact[ed]" with appellant regarding the donation that ProLine had made to the Monaville VFD.

Williams, the Monaville VFD's bookkeeper, received the ProLine invoice in her office on December 22, 2011, but she could not recall how it had arrived in her office. She noted that the "PAID By Check" notation on the invoice was not

"put . . . there" by her, and she assumed that it was on the invoice when she received it.

After receiving the ProLine invoice, Williams "created an invoice for [Waller County] EMS" from the Monaville VFD, which she mailed. The Monaville VFD invoice, State's Exhibit 1, requested reimbursement from Waller County EMS in the amount of $2,500 for ProLine's work "re-do[ing] [the] parking lot at [Fire] Station [Number] 2." Subsequently, appellant "told" Williams that the parking lot improvement had actually been "donated" by ProLine.

When Williams asked "why" the Monaville VFD was asking Waller County EMS "to pay [it] this money" when the parking lot improvement had been "donated," appellant replied that "he would take care of it." In another conversation, they agreed that if Waller County EMS "were to write [a] check" for the parking lot improvement, the Monaville VFD "could refund it or . . . apply [the money] to what" Waller County EMS owed. According to Williams, she, on "at least . . . two occasions," spoke to appellant about "the specific invoice from Pro-Line."

On December 5, 2011, Gregory met with two Waller County EMS representatives regarding the payment of "certain bills" related to Fire Station Number 2. In the meeting, she discussed the Monaville VFD's need for reimbursement from Waller County EMS for the parking lot improvement. According to Gregory, she included the parking lot improvement on the Monaville

VFD's written "Reimbursement Request to EMS from MVFD 12-5-11," State's Exhibit 5, because appellant had told her that the "Pro-Line asphalt bill was going to be $5,000." And she continued to pursue the Monaville VFD's reimbursement request for the parking lot improvement in email communications with Waller County EMS because appellant had "told [her] that [an] invoice had been turned into EMS" and ProLine had given the Monaville VFD an invoice for the parking lot improvement.

In his grand jury testimony, appellant admitted that, although the parking lot improvement by ProLine was a "donation," he, in January 2012, "realized" that the Monaville VFD had "billed" Waller County EMS for $2,500 for the parking lot improvement. Nevertheless, he "never sent" Waller County EMS "anything" and "never said a word to" Waller County EMS about the Monaville VFD's reimbursement request.

According to Hashaw and Becvar, Waller County EMS, in December 2011, January 2012, and November 2012, received requests from the Monaville VFD for payment of $2,500 for ProLine's improvement of the parking lot. Neither Hashaw nor Becvar nor "any representative of Waller County EMS" was ever told that it did not owe the Monaville VFD $2,500. And, at the time of their testimony, they believed that the Monaville VFD was "still requesting the $2,500" for the parking lot improvement.

Viewing all the evidence in the light most favorable to the jury's verdict, a rational juror could have concluded beyond a reasonable doubt that appellant either (1) created or confirmed by words or conduct the false impression that Waller County EMS owed the Monaville VFD $2,500 for ProLine's improvement of the parking lot that was likely to affect the judgment of Waller County EMS in the transaction, and that appellant did not believe to be true, or (2) failed to correct the false impression that Waller County EMS owed the Monaville VFD $2,500 for ProLine's improvement to the parking lot that was likely to affect the judgment of Waller County EMS in the transaction, that appellant previously created or confirmed by words or conduct, and that he "does not now believe to be true." *See* TEX. PENAL CODE ANN. § 31.01(1)(A)–(B). And a rational juror could have also concluded beyond a reasonable doubt that appellant had the intent to steal, i.e., an intent to unlawfully appropriate property with the intent to deprive the owner of the property. *See Wolfe*, 917 S.W.2d at 275; *Hicks*, 2014 WL 1922619, at \*2. Finally, a rational juror could have concluded beyond a reasonable doubt that appellant's actions amounted to more than mere preparation to appropriate $2,500 from Waller County EMS. *See* TEX. PENAL CODE ANN. § 15.01(a); *cf. Sorce*, 736 S.W.2d at 857–58; *see also Adekeye*, 437 S.W.3d at 68–70 (holding evidence sufficient where defendant took "overt acts . . . in furtherance of an aggravated robbery").

We note that although appellant argues that he lacked the requisite mental state for attempted theft because Waller County EMS never actually paid to the Monaville VFD the requested $2,500 and, "even if [Waller County EMS had] paid," the Monaville VFD "would have refunded the money or applied it to the balance ($11,291.63) that [it] was owed by" Waller County EMS, the State need *not* prove actual deprivation of property to establish a defendant's intent to commit theft. A person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE ANN. § 31.03(a). Actual deprivation is not required for a person to have an intent to deprive; the element which must be proved is not actual deprivation of property, but rather a person's intent to deprive at the time of the taking. *Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). While evidence of actual deprivation may constitute evidence of an intent to deprive, other evidence may also indicate the existence of an intent to deprive. *Rowland*, 744 S.W.2d at 612. Therefore, the fact that Waller County EMS did not actually pay the Monaville VFD $2,500, or that the Monaville VFD purportedly "would have refunded the money or applied to the balance ($11,291.63) that [it] was owed by" Waller County EMS, has no bearing on whether appellant acted with the intent required to commit attempted theft.

Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's fourth issue.

## Exculpatory Evidence and Jury Misconduct

In his second issue, appellant argues that the trial court erred in denying his motion for new trial because he "learned for the first time [at] trial that the State was in possession of exculpatory and impeaching evidence that severely went to the credibility of [its] principal and virtually only witness" and the State's "failure to produce and disclose that evidence" constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). In his third issue, appellant argues that the trial court erred in denying his motion for new trial because a "juror failed to disclose important information during jury selection." In response, the State argues that appellant "forfeited" his complaints because he untimely filed his amended motion for new trial.

We review a trial court's denial of a new-trial motion for an abuse of discretion. *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). We view the evidence in the light most favorable to the trial court's rulings and uphold them if they are within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We do not substitute our judgment for that of the trial court; rather we

30

decide whether the trial court's decisions were arbitrary or unreasonable. *Webb*, 232 S.W.3d at 112; *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). If there are two permissible views of the evidence, the trial court's choice between them cannot be held to be clearly erroneous. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 112.

A defendant may file a motion for new trial "before, but no later than 30 days after, the date when the trial court imposes or suspends [a] sentence in open court." TEX. R. APP. P. 21.4(a). And "[w]ithin 30 days after the date when the trial court imposes or suspends [the] sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial." TEX. R. APP. P. 21.4(b); *see also Shamim v. State*, 443 S.W.3d 316, 325–26 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("A defendant has the right to amend his motion within th[e] same 30-day period, without leave of court, as long as the trial court has not ruled on his pending motion."). However, a defendant may not amend his motion for new trial "outside of the thirty-day time limit, even with leave of the [trial] court," if the State properly objects. *State v. Zalman*, 400 S.W.3d 590, 593 (Tex. Crim. App. 2013); *see also Shamim*, 443 S.W.3d at 325–26 ("Once the 30-day period expires, a defendant may

31

not amend or enlarge his original motion to include additional claims, unless the State fails to make a timely objection to the amendment.").

On March 6, 2014, the trial court sentenced appellant to confinement for six months, suspended the sentence, and placed him on community supervision for two years. On March 18, 2014, appellant timely filed his "Initial Motion for New Trial," asserting that the "trial court ha[d] the discretion to grant [him] a new trial in the interest of justice." *See* TEX. R. APP. P. 21.4(a) (deadline to file new-trial motion). Subsequently, on April 11, 2014, appellant filed his "First Amended Motion for New Trial," asserting, for the first time, that the State had failed to disclose certain "impeachment and exculpatory evidence" in violation of *Brady* and a juror "withheld information that she ha[d] personal knowledge about [the] circumstances of [his] trial, that she was acquainted with the complainant and [him], and [that] by reason of past personal relationships and experiences, had the potential to be biased or prejudiced against [him]."

Prior to the hearing on appellant's amended motion for new trial, the State filed its "Objection to Defendant's First Amended Motion for New Trial," arguing that the trial court could not have a "hearing" on appellant's amended motion because he "untimely" filed it.[6] *See State v. Moore*, 225 S.W.3d 556, 570 (Tex.

---

[6] The State also raised its objection to appellant's amended motion at the motion-for-new-trial hearing, stating:

32

Crim. App. 2007) ("Rule 21.4(b) does permit the State to insist . . . that the trial court rule only upon the timely motion for new trial as originally filed or timely amended, but not as untimely amended." (emphasis omitted)); *Shamim*, 443 S.W.3d at 325–26.

Because appellant filed his amended motion thirty-six days after the trial court sentenced appellant and the State properly objected to the amendment, we may not consider any complaints raised in its amended motion. Instead, our review is confined to the arguments raised by appellant in his timely filed "Initial Motion for New Trial." *See Moore*, 225 S.W.3d at 570 (if State objects to untimely amended motion for new trial, trial court and appellate court should consider only original motion and any timely amendment and should not consider any matters raised for first time in untimely amendment); *see also Rangel v. State*, 972 S.W.2d 827, 838 (Tex. App.—Corpus Christi 1998, pet. ref'd) ("Even where the original motion for

---

[T]he State does object to the Court entertaining Defendant's First Amended Motion for New Trial. [The State's] objection was filed this morning, May 13th, 2014 at 8:24 a.m. with the Clerk. We hereby make that objection in open court. The Court in this matter imposed sentence on March the 6th, 2014; Motion for New Trial was filed on March 18th, 2014; Defendant's Amended Motion for New Trial was untimely filed on April the 11th of 2014.

. . . The State of Texas does hereby object to this Honorable Court hearing Defendant's First Amended Motion for New Trial as the same is untimely filed.

new trial is timely, an untimely amended motion for new trial is a nullity and cannot form the basis for points of error on appeal.").

Notably, in his "Initial Motion for New Trial," appellant did not raise either his *Brady* complaint or his jury misconduct complaint. Rather, he, in his motion generally asserted only that the trial court "ha[d] the discretion to grant [him] a new trial in the interest of justice." However, "in the interest of justice" is simply "not an independent basis for a trial court to grant a criminal defendant a new trial." *Quintero v. State*, 467 S.W.3d 671, 673–680 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *see also State v. Gomez*, No. 13-14-00585-CR, 2016 WL 744598, at *4–6 (Tex. App.—Corpus Christi Feb. 25, 2016, no pet.) (mem. op., not designated for publication) (defendant's "in-the-interest-of-justice allegation, standing alone, is not an independent legal claim or basis for granting a new trial").

To obtain a new trial "in the interest of justice," a defendant must articulate a valid legal claim in his motion. In other words, "even where a defendant urges a new trial on interest of justice grounds, '[a] motion for new trial, whether for guilt or punishment, [still] requires a valid legal claim.'" *State v. Vigil*, No. 08-13-00273-CR, 2015 WL 2353507, at *3 (Tex. App.—El Paso May 15, 2015, pet. ref'd) (not designated for publication) (first alteration in original) (quoting *State v. Thomas*, 428 S.W.3d 99, 107 (Tex. Crim. App. 2014)); *see also Smith v. State*, Nos. 01-12-00661-CR, 01-12-00662-CR, 01-12-00663-CR, 2013 WL 6729666, at *7–8

(Tex. App.—Houston [1st Dist.] Dec. 19, 2013, pet. ref'd) (mem. op., not designated for publication) (defendant "did not specify in her motion for new trial the reason why the trial court should [have] grant[ed] her a new trial in the interest of justice").

A defendant must allege sufficient grounds as to why he is entitled to a new trial; asserting "in the interest of justice" is not enough. *See State v. Gonzalez*, 855 S.W.2d 692, 694–95 (Tex. Crim. App. 1993); *State v. Provost*, 205 S.W.3d 561, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (defendant's argument "trial court can grant a motion for new trial in the interest of justice does not advance his case . . . because a defendant must allege sufficient grounds . . . to apprise the trial judge and the State as to why he believes himself entitled to a new trial" (emphasis omitted)); *see also State v. Dominguez*, No. 08-14-00011-CR, 2015 WL 4134562, at *6 (Tex. App.—El Paso July 8, 2015, no pet.) (not designated for publication) (trial court could not grant new trial on interest-of-justice grounds where defendant "made no specific allegations as to why she should receive a new trial in the interest of justice"). Appellant asserted no grounds in his "Initial Motion for New Trial" to support his assertion that he was entitled to a new trial "in the interest of justice."

Accordingly, we hold that the trial court did not err in denying appellant's motion for new trial.

We overrule appellant's second and third issues.

**Improper Argument**

In his fifth issue, appellant argues that the trial court erred in overruling his objections to the State's closing argument because the State "argued facts . . . that [it] knew were not supported by the record." In response, the State asserts that appellant has not preserved his complaint for our review.

Proper jury argument is generally limited to: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) answers to opposing counsel's argument; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex. App.—Houston [1st Dist.] 2013, no pet.). A trial court has broad discretion in controlling the scope of closing argument. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.). And the State is afforded wide latitude in its jury arguments, and it may draw all reasonable, fair, and legitimate inferences from the evidence. *Allridge v. State*, 762 S.W.2d 146, 156 (Tex. Crim. App. 1988).

Appellant specifically asserts that the State improperly "suggest[ed]" during its closing argument that he "must have come to ProLine['s] . . . office on different dates" when it argued: "We don't have to prove the exact day. We have to prove on or about that day. Okay. There is no issue there. . . . I don't recall Mr. Dawson ever committing to the fact that [appellant] was back in the office on the 28th." Appellant also asserts that the State "falsely argued" that "Dawson perceived

36

[a]ppellant to be physically impaired and in pain," by stating: "What did Mr. Dawson say? Said when [appellant] came in he was having some trouble, he needed to sit down really fast." And he asserts that the State improperly "[b]olster[ed]" the credibility of Dawson, "the only witness that could prove the [S]tate's theory of deception," by stating that he "is not currently under any trouble with [the State]." And, by doing so, the State "injected matters not in evidence."

To preserve error regarding allegedly improper jury argument, a party must object and pursue that objection to an adverse ruling by requesting an instruction for the jury to disregard, and if the instruction is given, moving for a mistrial. *See Archie v. State*, 221 S.W.3d 695, 698–99 (Tex. Crim. App. 2007); *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); *Brooks v. State*, 642 S.W.2d 791, 798 (Tex. Crim. App. 1982); *Washington v. State*, 127 S.W.3d 111, 115–16 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Here, appellant either did not object to the above portions of the State's closing argument, withdrew the objection he did make, or did not pursue his objection to an adverse ruling. *See Archie*, 221 S.W.3d at 698–99; *Cook*, 858 S.W.2d at 473; *Washington*, 127 S.W.3d at 115–16; *see also* TEX. R. APP. P. 33.1(a).

Accordingly, we hold that appellant has failed to preserve for our review his complaint regarding the State's closing argument.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).